430 P.2d 922

Robert SMITH, Appellant,

v.

Eddie GOODMAN, Appellee.

No. 1 CA–CIV 596.

Court of Appeals of Arizona.

Aug. 9, 1967.

O'Connor, Cavanagh, Anderson, West-over, Killingsworth & Beshears, by John H. Lyons, Phoenix, for appellant.

Hughes & Hughes, by John C. Hughes, Phoenix, for appellee.

CAMERON, Chief Judge.

This is an appeal from a jury verdict and judgment in favor of plaintiff Goodman for personal injuries received in an accident while the plaintiff was training a horse for the defendant Smith.

Two issues are presented for review by the Court of Appeals in this case:

1. Was the plaintiff Goodman an independent contractor or was he an employee?

2. If he was an employee, was the employer guilty of actionable negligence?

The facts necessary for a determination of this matter are as follows. Smith was lessee of a farm near Glendale and owner of a large two-year-old female horse or mare which he desired to have broken or trained to ride with a saddle. The plaintiff Goodman and defendant Smith became acquainted through a mutual friend, and negotiations ensued which resulted in Goodman going from Chandler to Glendale to live temporarily at Smith's farm to break the colt to ride.

Goodman at first requested that Smith allow him to take the horse to a place which he had available in Scottsdale where he could feed and care for the horse and ride her the times necessary to gentle her to the saddle. Goodman was wary of sending the horse to Scottsdale out of his supervision and control. It was finally agreed that Smith would pay Goodman $120 to break the animal, and the training would occur at Smith's farm near Glendale. Goodman had broken and worked with horses for most of his 58 years. It appears from Goodman's testimony that Smith required more training of the horse than Goodman had expected. Goodman found he would have to ride the horse more than the customary five or six times which he felt were necessary to train the horse to be ridden with a saddle because Smith required the horse be broken gently enough so that his young daughter could ride it.

It is evident from the testimony that Smith agreed to furnish Goodman with a

saddle, halter, bridle, and the other equipment necessary for the training of the horse. After Goodman arrived at the farm he determined that the corrals were unsuitable for riding or training the horse. After consultation with Smith, Goodman improvised a corral by putting cotton trailers in a circle. Plaintiff set a post in the ground in the center of the corral as a snubbing post to tie the horse, and this was used as a training area for her. From the testimony, at some time during this period Smith agreed to pay Goodman $1.00 per hour to build a new corral which could be used as a training corral for breaking the horse.

The record further discloses that the horse was large for its age and broke at least two halters from around its head and neck before Smith finally obtained one which was stout enough to hold the horse when tied securely to the snubbing post. The horse at one time broke loose from Goodman and jumped the wire fence to the outside of the 7½ acre enclosure into another similar enclosure belonging to Smith. Smith furnished Goodman with a "snaffel-bit" type bridle and also a rope approximately 30 feet in length, the ends of which were attached to either side of the bridle. Goodman testified that he objected to the long rope dragging out in an enclosed loop and avers he asked permission from Smith to cut the rope. Goodman claims that Smith would not allow him to cut the rope, but he did promise to buy him another more suitable and safe one. It is disputed whether the long rope was made of more expensive nylon or of cotton as Smith claims. Smith also claims that he did not remember objecting to Goodman cutting the rope or promising that he would get him another one:

"Q And do you recall whether it was an expensive or an inexpensive rope?

"A I don't recall, it wasn't necessarily expensive I am sure it wasn't an expensive rope, as nylon rope, but—

"Q Did you have any other intended purpose for the rope other than for what Mr. Goodman wanted to use it for?

"A No.

"Q Did Mr. Goodman ever ask you to cut the rope, to your knowledge?"

"A I don't remember."

It is disputed how much Smith knew about training horses, and it is also disputed how much control Smith exerted over Goodman in Goodman's efforts to break the horse. Goodman's testimony is that Smith wanted him to train the horse so the child could ride her, and also Smith objected to Goodman "roughing up" the mare or allowing her to buck. Goodman claims that his method was to ride the horse and allow it to buck if it insisted. Smith reportedly objected to this method and insisted the horse be prevented from ever bucking so that she would not have the proclivity to buck later if the child got in the situation where the horse would be excited or otherwise stimulated to buck.

On the day of the accident the corral had been finished by Goodman, and it was his intention to move the mare from the cotton trailer corral to the new corral. In order to do this it was necessary to move one of the cotton trailers and make available a gate or opening through which the mare could be taken. At about 4:00 in the afternoon of the day of the accident a friend of Goodman's named Jack was on the ranch and had tied the mare to the snubbing post in the center of the cotton trailer corral. Jack thereafter went to the tractor which was hitched to one of the trailers and was in the process of moving the trailer when Goodman returned to the corral from his house. The mare became frightened by the noise of the tractor and the moving of the trailer, reared, and was able to come loose from the snubbing post because she was insecurely tied. Goodman recognized the danger that the animal would escape from the corral carrying the saddle and dragging the loop of rope behind her. He testified he was afraid the animal would become frightened and run through a barbed wire fence and seriously injure herself. Good-

man grabbed hold of the loop of rope behind the horse in his efforts to stop the horse from running away. He stepped inside the loop which was dragging, and somewhere in the enclosed fields of the pasture Goodman's foot was stopped on a raised border of the land. He was thrown in the air and when he struck the ground, his leg was seriously broken and injured. Goodman lay in the field for approximately one hour before he was taken by ambulance to St. Joseph's Hospital. The testimony of the doctors is that the break was a severe one and the injuries will be permanent to Goodman.

The appellate court will review the findings of the trial court in the strongest light to support the judgment. Chantler v. Wood, 6 Ariz.App. 134, 430 P.2d 713, filed 25 July 1967, Consolidated Credit Corp. v. Laurence, 5 Ariz.App. 568, 429 P.2d 455, filed 29 June 1967. The appellate court will view the evidence of negligence in the light most favorable to the prevailing party in the trial court. Where there is conflicting evidence, the Court will not disturb the trial court's findings. Korrick v. Robinson, 20 Ariz. 323, 180 P. 446 (1919); Inter-State Fidelity Building & Loan Ass'n v. Hollis, 41 Ariz. 295, 17 P.2d 1101 (1933); Jimenez v. Starkey, 85 Ariz. 194, 335 P.2d 83 (1959); City of Phoenix v. Schroeder, 1 Ariz.App. 510, 405 P.2d 301 (1965); Powell v. Industrial Commission, 4 Ariz.App. 172, 418 P.2d 602 (1966).

Since this accident is not covered by the Workmen's Compensation Act, A.R.S. § 23-901 et seq., any recovery to the plaintiff must be on the basis of common law tort and negligence doctrines. A.R.S. § 1-201, Ross v. Bumstead, 65 Ariz. 61, 173 P.2d 765 (1946).

We must first determine whether the plaintiff is an employee of Smith or if he is an independent contractor. A statement of the rule that governs the cases where there is a question whether the injured person is an employee or an independent contractor is given in the case of Arizona Binghampton Copper Company v. Dickson, 22 Ariz. 163, 170, 195 P. 538, 540, 44 A.L.R. 881 (1921):

"The general rule is that a contractor cannot recover damages from his employer for injuries he may sustain in the performance of his contract, and it is predicated upon the fact that the contractor has control and is bound, as every principal is, to provide for his own safety and protection."

The Supreme Court of Arizona has stated the test for determining whether an agent is an employee or an independent contractor:

"The body of law concerned with distinguishing independent contractors from employees is, indeed, huge. And though no hard and fast rule can be set forth, but instead each case must be determined by the sum total of its own facts, the general test laid down by our own statute (Sec. 56-928) and by the great weight of authority is whether the alleged employer 'retains supervision or control over the method of reaching a certain result, or whether his control is limited to the result reached, leaving the method to the other party.' (citation) In order to apply this test and so determine the extent of this 'right of control', courts look for a variety of signposts or indica none of which are in themselves conclusive but which when taken together and applied to a particular set of facts, aid in making the line to be drawn more clear. (citations)." Blasdell v. Industrial Commission, 65 Ariz. 373, 376, 181 P.2d 620, 622 (1947).

The Restatement of the Law of Agency 2d, has two sections which are helpful in determining and distinguishing between employees and independent contractors. Section 2 defines a servant. Section 220 continues the definition:

"(1) A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is

subject to the other's control or right to control. (2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered: (a) the extent of control * * * (by) the master * * * over the details of the work; (b) whether or not the one employed is engaged in a distinct occupation or business; (c) the kind of occupation, * * * whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (d) the skill required in the particular occupation; (e) whether the employer or the workman supplies the instrumentalities, tools, and place of work * * *; (f) the length of time for which the person is employed; (g) the method of payment, whether by the time or by the job; (h) whether or not the work is a part of the regular business of the employer; (i) whether or not the parties believe they are creating the relation of master and servant; and (j) whether the principal is or is not in business. Comment C. *Generality of Definition.* The relation of master and servant is one not capable of exact definition. * * * And it is for triers of fact to determine whether or not there is a sufficient group of favorable factors to establish the relation."

The Arizona Supreme Court has looked to all the factors in each instance to determine whether the independent contractor relationship or the employer-employee relationship existed. Barker v. General Petroleum Corporation, 72 Ariz. 187, 232 P.2d 390 (1951) and as modified in 72 Ariz. 238, 233 P.2d 449 (1951), Throop v. F. E. Young and Co., 94 Ariz. 146, 382 P.2d 560 (1963).

█ We hold that the jury could have found an employee relationship existed in this case in light of the fact that there was conflict in the testimony of the parties and conflict in the evidence as presented at the trial. We find that the jury could have found from the evidence as presented in its entirety and after observing the witnesses the facts of an employer-employee relationship existed. It is true that a set price of $120 was established for breaking the horse. However, it developed from the testimony as given by the plaintiff that the defendant controlled the method of horse breaking and controlled when it was saddled and ridden to the extent that after 2 weeks Goodman had not gotten on the horse to ride it. The defendant furnished tools, place to live, and necessary arena or corrals in which to break the horse. Control by the defendant was also exhibited by the testimony of the plaintiff that defendant would not allow him to cut the long rope which he provided the plaintiff.

█ In order for the plaintiff to recover he must show that the defendant-employer was negligent in the employer's duty to the employee:

"It was the duty of the city to furnish the plaintiff a reasonably safe place in which to work and reasonably safe instrumentalities with which to do his work." Morrell v. City of Phoenix, 16 Ariz. 511, 513, 147 P. 732, 734 (1915).

"It is the duty of a carrier to exercise reasonable care to provide a safe place for its employees to work. Failure to use such care constitutes actionable negligence." Apache Railway Company v. Shumway, 62 Ariz. 359, 367, 158 P.2d 142, 146, 159 A.L.R. 857 (1945).

We find that the trial court and the triers of fact could reasonably have found the defendant in this instance did not fulfill his duty to the plaintiff in supplying him with safe tools and materials to work with or a safe place and working conditions. The plaintiff testified that he had objected to the long rope and the loop dragging behind the colt, and he also testified the defendant had promised to supply him with a new and different rope which would have eliminated the loop dragging behind the horse. We think it is foreseeable the plaintiff in this instance be snared in the loop when working with and training the horse, the accident as it occurred could foreseeably have happened, and the plaintiff was the person

who would be injured by the danger. The defendant therefore did not fulfill his duty and maintain the standard of care for the proper tools and safe working conditions which he owed to the employee-plaintiff.

But even if an independent contractor relationship should be found, as the appellant contends, the defendant would still *not* necessarily be relieved of liability. Where the principal undertakes to supply the materials with which the independent contractor works, he is liable for failure to supply safe and proper tools or materials:

> "If the employer retains the right of control, or—as in this case—he agrees to furnish the instrumentalities to the contractor to be used in his work, and the latter is injured by the reason of their being defective, a different rule comes into play. The rule deducible from the decisions is well settled in 14 R.C.L. 81, § 19, as follows: 'Where the employer reserves the right to direct the manner of the performance of the contract in any particular, or where he undertakes to provide any of the instrumentalities, he owes to the contractor and the latter's employees the duty of exercising reasonable care in respect to such matters'." Arizona Binghampton Copper Co. v. Dickson, supra, 22 Ariz. at page 170, 195 P. at page 540.

It is necessary for the plaintiff to show the negligence of the defendant was a proximate cause of the accident and injury complained of:

> "But after the jury finds such a violation, the question of the proximate cause of the accident remains to be answered, Mercer v. Vinson, 85 Ariz. 280, 336 P.2d 854." J. H. Welch & Son Contracting Co. v. Gardner, 96 Ariz. 95, 99, 392 P.2d 567, 570 (1964).

In this instance the defendant claims a proximate cause was the negligence of the person "Jack" who moved the trailer and thereby allowed the horse to become frightened and run away. We do not agree with this contention. The negligence which the jury could properly find the defendant committed was that of supplying a rope which was long and which had a loop dragging behind the horse and which is obviously dangerous to anyone working with the animal. It is not necessary that the exact manner in which the accident occurred be foreseeable in order for the negligence of the defendant be a proximate cause or causative negligence:

> "To constitute proximate cause the injury must be the natural and probable consequence of the negligence, and be of such a character as an ordinarily prudent person ought to have foreseen might probably occur as a result of the negligence. It is not necessary that the person guilty of a negligent act or omission might have foreseen the precise form of the injury; but, when it occurs, it must appear that it was a natural and probable consequence of his negligence." Seith v. Commonwealth Electric Co., 241 Ill. 252, 89 N.E. 425, 427, 24 L.R.A.,N.S., 978 (1909).

In this case there would be numerous ways in which the sequence of events could lead to the plaintiff being ensnared in the dragging loop. Creating the danger of the loop and the plaintiff being dragged is the exact negligence which the jury found defendant committed by supplying the long rope. It is not for the defendant to say that because someone else made the accident possible or was negligent, the negligence of the defendant, which was a causative factor in the plaintiff's injury, had thereby been alleviated or exonerated. Blakely Oil v. Crowder, 80 Ariz. 72, 292 P.2d 842 (1956). We hold that the negligence of the defendant in supplying the faulty equipment was a proximate cause of the accident and the jury under proper instructions of the court has properly so found. Safeway Stores, Inc. v. Cone, 2 Ariz.App. 151, 406 P.2d 869 (1966); Stearman v. Miranda, 97 Ariz. 55, 396 P.2d 622 (1964).

The defendant claims the plaintiff had assumed the risk by the fact he had knowingly continued to use the rope for

**174**

approximately two weeks. He also claims the plaintiff committed contributory negligence when he grabbed hold of the rope in spite of the danger when the horse was threatening to run away, and the assumption of the risk and contributory negligence was uncalled for and not part of his duty. The defendant claims the plaintiff should have let the horse run out of the corral and run freely in the small enclosure. The plaintiff argues that he was afraid the horse would be so frightened she would run through a fence and be seriously injured along with the saddle she was carrying. The plaintiff contends that any possible assumption of the risk was exonerated by his giving notice to the employer and by the employer's promise to get him a suitable rope. The general rule is stated in 35 Am. Jur., Master and Servant, § 315, page 743:

"According to a well settled general rule, the 'assumption of risk' or responsibility which is based upon the employee's knowledge that a tool, instrument, appliance, piece of machinery, or place of work is defective or dangerous is suspended by the employer's promise to repair, made in response to the employee's complaint, so that, if the employee has been induced by the promise to continue at work, he may recover for an injury which he has sustained by reason of the defect within a reasonable time after the making of the promise. * * *"

Contributory negligence and assumption of risk are questions of fact for the jury as required by the Arizona Constitution, Article XVIII, Section 5, A.R.S., and the jury in this instance could have found for the plaintiff on these issues. Morenci Southern Railway Company v. Monsour, 24 Ariz. 49, 206 P. 589 (1922). The defendant has the burden of proof on these affirmative defenses and the jury could readily have found that he had not sustained his burden of proof on these issues.

The defendant also contends the plaintiff assumed the risk under the rule of

Peyatte v. International Harvester Co., 4 Cir., 208 F.2d 261, 264 (1953):

"Where an employee attempts at some hazard to himself to do something for the supposed protection of his employer's property without any real necessity for so doing, or because under all circumstances the employee's act was rash and beyond the call of duty to his employer, such act itself becomes the proximate cause of the injury and the employer is not liable."

We find that the plaintiff was reasonable in his actions in this instance to protect his employer's property from the danger of serious injury and damage. Since there was a real danger and the plaintiff had the duty to protect his employer's property, he was acting for the interests of the employer and was not foolishly assuming the risk.

Judgment affirmed.

DONOFRIO and STEVENS, JJ., concur.